(64 Misc. Rep. 205.)

### WEEKS–THORN PAPER CO. v. GLENSIDE WOOLEN MILLS.

(Supreme Court, Special Term, Onondaga County.   July, 1909.)

1. EVIDENCE (§ 10*)—JUDICIAL NOTICE—AREA OF LAKE.

Judicial notice may be taken that a lake has some 13 square miles of surface.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 13; Dec. Dig. § 10.*]

2. WATERS AND WATER COURSES (§ 68*) — RIPARIAN OWNERS — POLLUTION OF STREAM.

Plaintiff paper company operated its mill on a stream using the water both for power and for mixing with the material from which paper was made, and required water comparatively pure to mix with wood pulp. Defendant woolen company had a mill one-half mile up the stream, where it manufactured black woolen cloth and also used the water both for power and other purposes. Still farther up the stream was the mill of a felt company, four paper mills, and a septic tank for the conversion of sewage from a village. Defendant discharged into the stream its waste products, consisting of dirt and soap, resulting from the washing of woolen rags from which its cloth was made, and also quantities of black aniline dye and woolen fiber. The felt mill and the paper mills above it, and possibly the septic tank, also caused considerable pollution. *Held*, that the pollution of the stream by defendant was unreasonable and unlawful, which no amount of pollution by others would justify.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 59; Dec. Dig. § 68.*]

3. EMINENT DOMAIN (§ 319*)—CONDEMNATION FOR PUBLIC WATER SUPPLY—RIGHTS ACQUIRED.

Though the city of Syracuse obtained, by condemnation proceedings under Laws 1889, p. 358, c. 291, as amended by Laws 1890, p. 601, c. 314, the right to take from Skaneateles Lake all the water it needs for its purposes, and so diminish the flow in the outlet from the lake, riparian owners along the outlet retained the right to use, in the ordinary way, such water as the city may still permit to flow down the outlet, and to have such surplus water flow without unreasonable pollution or diminution on the part of third persons.

[Ed. Note.—For other cases, see Eminent Domain, Dec. Dig. § 319.*]

4. NUISANCE (§ 59*)—"PUBLIC NUISANCE" DEFINED.

A "public nuisance" is an offense against the public order and economy of the state, by unlawfully doing any act or omitting to perform any duty which the common good, public decency or morals, or the public right to life, health, and the use of property, requires, and which at the same time annoys, injures, renders insecure, or obstructs the rights or property of the whole community, or any considerable number of persons.

[Ed. Note.—For other cases, see Nuisance, Cent. Dig. §§ 135, 136; Dec. Dig. § 59.*]

5. NUISANCE (§ 73*)—POLLUTION OF WATERS—PRESCRIPTIVE RIGHT.

Where the very act declared illegal by Pen. Code § 390, prohibiting the discharge of any noxious, offensive, or poisonous substance into public waters or streams running into such waters, is the act that damages plaintiff, no continuance thereof could create a prescriptive right.

[Ed. Note.—For other cases, see Nuisance, Cent. Dig. § 172; Dec. Dig. § 73.*]

Action for injunction by the Weeks-Thorn Paper Company against the Glenside Woolen Mills.   Finding for plaintiff.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Olmsted & Van Bergen, for plaintiff.
Lewis & Crowley, for defendant.

ANDREWS, J. The court may take judicial notice that Skaneateles Lake has some 13 square miles of surface. That its water is pure may be assumed from the fact, appearing in evidence, that the city of Syracuse uses it for domestic purposes. Its outlet is Skaneateles creek, flowing northerly through a narrow gorge, past the villages of Jordan and Elbridge, to the Erie Canal, of which it is a feeder, and thence to the Seneca river. The plaintiff operates a paper mill situated on this creek, using the water both for power and for mixing with the material from which paper is made. Its mill is situated some miles below the lake. Next up the stream, and a half a mile away, is the defendant's mill. It manufactures black woolen cloth, and also uses the water both for power and for other purposes. Still farther up the stream are the mill of the Waterbury Felt Company, manufacturing the felt used on paper machines, four paper mills, and a septic tank for the conversion of the sewage of the village of Skaneateles.

In paper making, water comparatively pure is needed for mixing with the wood pulp. If it contains coloring matter, it will stain the pulp, and so render the manufacture of white paper impossible. If it contains greasy or sticky particles, these particles will adhere to the wires on which the pulp is spread, so causing the paper either to be of an uneven thickness or to contain holes, or else the particles will stick to the paper, so injuring its quality. It is clear that the Waterbury Felt Company's mill and the paper mills above it, possibly also the septic tank of the village, have caused considerable pollution of the stream. That such is the fact appears clearly from the photographs in evidence and from the testimony of various witnesses. It is equally clear that the defendant's mill has added largely to this pollution. It has discharged into the stream its waste products, consisting of dirt and soap resulting from the washing of woolen rags out of which its cloth is made, and also quantities of black aniline dye and woolen fiber. Shortly before the trial, it endeavored to turn its waste away from the stream into a marsh, but did it in such a manner as not greatly to change the result.

I have no difficulty in finding that the use made of the stream by the defendant is unreasonable and unlawful. It is true that the fact that others are likewise polluting it may have a bearing upon the question as to whether the acts of the defendant are or are not reasonable, as may the number of men employed by it, the benefits to the community arising from its operation, the necessity of doing what it has done, and various matters of that kind. But no amount of pollution by others will justify an unreasonable use of the stream by defendant. No benefit to its employés or to the public at large will justify it in depriving the plaintiff of its property. The mere fact that it may require some expense to properly dispose of its refuse is no answer to the plaintiff's claim. Neither do I have any difficulty in finding that the use made of the stream by the defendant has damaged the plaintiff.

The serious questions involved in the case are: First, what right, if any, the plaintiff has in the stream; and, second, whether it has lost

the right to complain of the use made of it by the defendant because of the alleged continuance of that use for over 20 years.

Precisely what rights the plaintiff has in this stream depends on the effect of various proceedings taken by the state of New York and by the city of Syracuse. In the year 1843 the state appropriated the waters of Skaneateles Lake and its outlet for the use of the Erie Canal. But this appropriation was effectual only as against those owners whose lands and water rights were, by the plan presented to the canal board, taken and appropriated, and who were specially designated and known and described in the report, the plan, and the map before the board when the resolution was adopted. These owners did not include the plaintiff or its predecessors in title. Therefore, so far as it was concerned, its rights in the water of Skaneateles creek as it flowed past its mill were never affected. Waller v. State of New York, 144 N. Y. 579, 39 N. E. 680.

Chapter 291, p. 358, of the Laws of 1889, empowered the city of Syracuse to construct a system of waterworks to furnish the city with water from Skaneateles Lake, and to acquire therefor lands, waters, easements, and property necessary for that purpose owned by any individual or corporation. This act was amended by chapter 314, p. 601, of the Laws of 1890, which provided that the city should acquire or extinguish all water power rights upon the outlet of said lake to be affected. It also provided that the rights of the city thereby conferred should be subject to the superior claims of the state to the water, and the city was authorized to take water from the lake not required for the Erie Canal.

The plaintiff's predecessor in title, the Hartlot Paper Company, was then the owner of the property now operated by it. It, with others, was made a defendant in condemnation proceedings brought by the city. On January 28, 1893, a judgment of condemnation was rendered, decreeing, among other things, that upon making compensation therefor the city of Syracuse was entitled to condemn and acquire or extinguish all the rights, title, and interest which the defendants in that proceeding and each of them respectively had of, in, and to the waters of Skaneateles Lake and its watershed, and to any and all use and enjoyment thereof, by reason of their ownership of, or interest in, the premises severally described in the petition, and as appurtenant or incident to said premises, for the purpose of supplying said city and its inhabitants with water, excepting only such and so much water from said lake as might be permitted or caused to flow from said lake into the outlet thereof, from time to time, by the state of New York, its officers and agents, for the purpose of supplying the Erie Canal with water, and excepting, also, such water as might from time to time from any cause escape from said lake, and be discharged therefrom into the outlet; that the defendants and each of them, as against the city of Syracuse, and without any interference on its part, should at all times be entitled to use and enjoy any and all water derived from any source, which should thereafter flow in the outlet of Skaneateles Lake, upon, along, over, and contiguous to the several parcels of land owned by them, respectively, the same as if this proceeding had never been taken; that, upon making compensation therefor, the city

of Syracuse should be entitled in that proceeding, as against the defendants, to condemn and acquire the right to increase the storage capacity of Skaneateles Lake sufficiently to retain therein all the ordinary flow from the watershed, and to at all times store and retain therein so much thereof as should not be required for the Erie Canal, and, subject to the rights of the state to use the same for the supply of the Erie Canal, to divert therefrom at all times so much thereof as might be necessary to supply the city of Syracuse and its inhabitants with water; that the acquisition or extinguishment of the defendant's rights as above defined and set forth was the acquisition or extinguishment contemplated and required by chapter 314, p. 601, of the Laws of 1890; that the condemnation hereby authorized was for a public use, and for the purposes contemplated by the laws hereinbefore referred to; that the plaintiff was entitled to condemn and acquire and extinguish all and several the rights, title, and interest of the defendant, the Hartlot Paper Company, of, in, and to the waters of Skaneateles Lake and its watershed not required by the state of New York for the Erie Canal, as the same flowed or might otherwise flow in the outlet of said lake, and upon, along, over, contiguous, and appurtenant to the land and premises adjacent to said outlet, described as follows: (Here follows a description of the plaintiff's premises.)

On January 30, 1893, commissioners were appointed, and they rendered their report on May 7, 1894, in which there was awarded to the Hartlot Paper Company, "for the property and water rights and for depreciation in value of the property, $22,000." On May 19, 1894, an order and judgment was rendered confirming this report and directing that compensation be made by the city of Syracuse to the Hartlot Paper Company in the sum of $22,000 "as compensation for all and several its rights, title, and interest of, in, and to the waters of Skaneateles Lake and its watershed not required by the state of New York for the Erie Canal as the same flowed or might otherwise flow in the outlet of said lake and upon, along, over, contiguous, and appurtenant to the lands and premises adjacent to said outlet described as follows: [Here again follows a description of the plaintiff's premises.]" This award of $22,000 was accepted by the Hartlot Paper Company and was paid by the city of Syracuse.

It is claimed by the defendant, in view of these acts, that, while the plaintiff may have retained all its rights in such part of the water flowing past its premises as is required by the state of New York for the use of the Erie Canal, yet, as regards such water as is not so required, it has no interest or right in it whatever, and that no injury is done to it by the pollution of such water. If this claim is correct, it would follow that the burden would be upon the plaintiff to show what water was required by the state for the canal, that being the only water which it had the right to use in any manner or in which it had any interest, and that it could only recover damages for the pollution of that restricted portion of the water flowing down the outlet during the months when water is required for the canal. While the order of confirmation is very broad, while it speaks of the $22,000 as being compensation for all the rights, title, and interest of the Hartlot Paper Company in the waters of the outlet as the same flow or might otherwise

flow along and past its premises, yet, when this phrase is construed in connection with the judgment of condemnation, it is apparent that, while the city of Syracuse has obtained the right to take from Skaneateles Lake all the water it may need for its purposes, and so diminish the flow in the outlet, the riparian owners along the stream have retained the right to use, in the ordinary way, such water as the city may still permit to flow down that stream. It is said that the city is entitled to acquire the interest of the defendant in and to the waters of Skaneateles Lake and its watershed "for the purpose of supplying said city and its inhabitants with water," excepting such as may be needed for the Erie Canal, "and excepting such water as may from time to time from any cause escape from said lake and be discharged therefrom into the outlet." It is further said that the defendant, as against the city of Syracuse, will be "at all times entitled to use and enjoy any and all water derived from any source which shall hereafter flow in the outlet of Skaneateles Lake * * * the same as if this proceeding had never been taken." Again, the city of Syracuse acquires the right as against the defendant to increase the storage capacity of Skaneateles Lake, and "to divert therefrom at all times so much thereof as may be necessary to supply the city of Syracuse and its inhabitants with water." Lastly, that the acquisition and extinguishment of the defendant's rights as above defined is the acquisition and extinguishment contemplated by chapter 314, p. 601, of the Laws of 1890; that the condemnation hereby authorized is for a public use and for the purposes contemplated by the laws hereinbefore referred to. The laws so referred to contemplated the diversion by the city of Syracuse of so much water as may be needed for its use, and that was their purpose. The condemnation for a public use could only be a condemnation to that extent and for that amount.

It would be an unreasonable construction to hold that the surplus waters flowing down Skaneateles outlet over the plaintiff's land could not be used by it; that, if it attempted to water cattle in the stream, or to use the water for drinking purposes in its mill, it would be a trespasser as against the city. What the city acquired was not title to the water itself. In that no property right could be obtained. It was not the right to prohibit abutters along the stream from using what flowed past their premises. It was solely the right to take from time to time from Skaneateles Lake so much of the water as it might need. If this be so, the plaintiff still retains the right to have such surplus waters flow, without unreasonable pollution or unreasonable diminution on the part of third parties.

The next serious question arising in the case is as to the alleged acquisition of the right to pollute this stream acquired by the defendant by prescription. Clearly such a pollution as is here complained of constitutes a public nuisance. A public nuisance has been defined as:

"An offense against the public order and economy of the state, by unlawfully doing any act or by omitting to perform any duty which the common good, public decency or morals, or the public right to life, health, and the use of property requires, and which at the same time annoys, injures, endangers, renders insecure, interferes with, or obstructs the rights or property of the whole community, or neighborhood, or any considerable number of persons." Joyce, Nuis. § 5.

It is also said that:

"Public nuisances are founded upon wrongs that arise from the unreasonable, unwarrantable, or unlawful use of property, or from improper, indecent, or unlawful conduct, working an obstruction or injury to the public, and producing material annoyance, inconvenience, and discomfort." Bohan v. Port Jervis G. L. Co., 122 N. Y. 18–32, 25 N. E. 246, 250, 9 L. R. A. 711.

The Legislature of the state has declared that such acts as those of the defendant are an injury to the public at large. Section 390 of the Penal Code, first enacted in 1881, long before any adverse user in this case is said to have started, provides that:

"A person who throws or deposits gas  *  *  *  or the refuse of a gas house or gas factory, or offal, refuse, or other noxious, offensive or poisonous substance into any public waters, or into any sewer or stream running or entering into such public waters, is guilty of a misdemeanor."

While Skaneateles creek may not come within the definition of "public waters," yet it is clearly a stream "running or entering into such public waters." Section 25, c. 534, p. 589, of the Laws of 1879, provided that no person should throw or deposit any dyestuff, coal tar, refuse from gashouses, sawdust, lime, or other deleterious substance, or cause the same to run or flow into or upon any of the rivers, lakes, ponds, or streams, within the limits of this state. This section did not apply, however, to streams of flowing or tide water which constitute the motive power of the machinery of manufacturing establishments, where it is absolutely necessary for the manufacturing purposes carried on in such establishments to run the refuse matter and material thereof into such stream. It does not appear that it was "absolutely necessary" for the defendant to make such use of the stream.

Section 100, c. 488, p. 991, of the Laws of 1892, repealed the section just quoted and provided:

"No dye-stuff, coal tar, refuse from gas houses, sawdust, shavings, tanbark, lime or other deleterious or poisonous substance, shall be thrown or allowed to run into any of the waters of this state, either private or public, in quantities destructive of the life of, or disturbing the habits of fish inhabiting the same."

This section was practically re-enacted as section 52 of the forest, fish, and game law. The evidence in the case shows that the dye allowed by the defendant to run into this stream is poisonous and is in quantities sufficient to be destructive of fish in the same.

It is the general rule that in proceedings by the people there can be no prescription for a public nuisance. Whether, however, a person exercising a trade or occupation, which is a public nuisance, can acquire a prescriptive right to carry on the same as against individual rights is not so clear. In Kelley v. Mayor, 89 Hun, 246, 35 N. Y. Supp. 1109, Judge Dykman defines nuisance as consisting of three classes, public, private and mixed, the latter being nuisances which are public and which at the same time cause special damage to private individuals; and in the course of his opinion he says that no person can obtain a prescriptive right to maintain a public nuisance. "It is presumed the same rule applies to a mixed nuisance as that is in one sense public." In Mayor v. Land, 137 Ala. 538, 34 South. 613, the city of Birmingham was polluting a stream on the banks of which the plaintiff owned certain land, by emptying its sewerage therein. It was held

that the nuisance was a public one, and that no right to continue such nuisance, even as against an individual, could be acquired by prescription. In Bowen v. Wendt, 103 Cal. 236, 37 Pac. 149, it is said that no lapse of time can legalize a public nuisance, and a prescriptive right cannot be maintained against a public nuisance where the action is brought by a private party who has suffered special injury in consequence thereof. This was also a case of the pollution of the waters of a stream. The same rule was held in Meiners v. Brewing Co., 78 Wis. 364, 47 N. W. 430, 10 L. R. A. 586, and in Woodruff v. Mining Co. (C. C.) 18 Fed. 753. See, also, cases cited in 21 Am. & Eng. Ency. of Law (2d Ed.) 734, article "Nuisance."

On the other hand, it has been held that, although a nuisance be a public one, yet so far as individuals are concerned a prescriptive right may be obtained. Charnley v. Shawano Co., 109 Wis. 563, 85 N. W. 507, 53 L. R. A. 895 (case of a dam on a navigable stream); Perley v. Hilton, 55 N. H. 444. In other cases it is said that no prescriptive right can be obtained against the public, nor against an individual especially injured who claims under and by virtue of the public right, yet it may be in other cases. Inhabitants v. Eagle Co., 138 Mass. 8; Mills v. Hall, 9 Wend. 315, 24 Am. Dec. 160. In Mills v. Hall, a nuisance was created by the erection of a dam across the outlet of Lake Paradox, corrupting the atmosphere and affecting the health of the plaintiff and his family. The court said:

"There is no such thing as a prescriptive right, or any other right, to maintain a public nuisance. Admitting that the defendant's dam has been erected and maintained more than 20 years, and that during the whole of that period it has rendered the adjacent country unhealthy, such length of time can be no defense to a proceeding on the part of the public to abate it, or to an action by any individual for the special and peculiar injury which he may have suffered from it."

Yet the court adds:

"If the defendants have for 20 years been permitted to overflow the plaintiff's land with their mill pond, so far as the injury to the land is concerned, they have by that length of possession acquired a right to use it in that manner and are not responsible in damages to the plaintiff."

In other words, to avoid the defense of prescription, the plaintiff must show that his special injury arises from the same causes which make the act of the defendant a public nuisance. If a millpond is a public nuisance because it causes disease, if the plaintiff's health is injured, he may recover. But the flooding of private land by the dam would not make it a public nuisance. So to this extent a right might be gained by prescription. So, if an act were a public nuisance because it destroyed fish and so interfered with the public welfare, a person whose fishing rights were injured would never lose them by prescription. But, if the same pollution of the stream interfered with the use of the water for manufacturing purposes, he would have no remedy, so far as this particular injury was concerned, after 20 years.

The principle laid down in Mayor v. Land and Bowen v. Wendt seems the more reasonable. Title by prescription is always based upon

the theory that 20 years' user is conclusive evidence of the existence of a grant which has been lost. Where, however, a grant could not have been made in the first instance, where such a grant would have been illegal and would have conveyed nothing, then the very basis of the presumption fails, and no amount of user will give title by prescription. If the act of the defendant had not been a misdemeanor, and had not constituted a public nuisance, if it had been merely a taking of the plaintiff's property, or the subjection of it to damage, such rights might have been granted; and, consequently, user will afford a presumption that they actually were so granted. But, if there were a grant in this case, it was not a grant of this kind. It was a grant that the defendant might pour poisonous and offensive refuse into this stream. But neither the plaintiff, nor all the abutting owners on Skaneateles creek together, could have granted to the defendant the right to do what the statute says it shall not do. No such grant could have had any effect. It would have been against public policy and void. This being so, no continuance of the illegal act could raise a presumption that a grant was made. So in the case of a milldam across a navigable stream. The grant, if made, must have been to erect such a structure, or to flood lands by means thereof. The act by which the effects are produced being illegal, how may a grant to produce those effects be presumed?

But this question need not be decided in this case. Whatever may be said of the statutes designed for the protection of fish, at least the provision of the Penal Code is a general one. It prohibits the deposit of offal, refuse, or other noxious, offensive or poisonous substances in Skaneateles creek. Now the very act declared illegal is the act that damages the plaintiff. It makes its claim "under and by virtue of the public right." Having reached the conclusion, therefore, that the plaintiff is entitled to the use of all the water flowing down Skaneateles creek without unreasonable pollution of the same or unreasonable diversion thereof, that the defendant has polluted it unreasonably and unlawfully, and that it has acquired no right to continue such acts by any prescription, I reach the question of the relief to be afforded in this action.

I shall not review the evidence at length. I have decided to award the plaintiff for damages up to the date of the trial of this action the sum of $1,500. The plaintiff is also entitled to an injunction enjoining the continuance of the illegal acts herein complained of; but in granting such injunction care should be taken that no unnecessary damage be done to the defendant. It has already, as appears, made some efforts, although they have not been successful, to remedy the condition of the stream brought about by its acts. It is, as has been said, a large manufacturing establishment, employing many men, and an injunction forcing it to cease its business until a proper remedy can be applied would be of far more damage to it than of benefit to the plaintiff. Under the circumstances, I will grant an injunction restraining it from polluting the stream in question by the deposit in it, directly or indirectly, of the refuse from its mill, but providing that such injunction shall not take effect until the 1st day of January, 1910, provided the defendant pay to the plaintiff the sum of $200 for the

damages suffered by the plaintiff for the continuance of the nuisance until such time.

The findings in the case and the precise form of the judgment will be settled upon notice.

Judgment accordingly.