[No. 24340.  Department Two.  April 11, 1933.]

D. H. BALES, *Respondent*, v. THE CITY OF TACOMA,
*Appellant*.[1]

*W. W. Mount, John E. Gallagher,* and *Bartlett Rummel,* for appellant.

*Howard Carothers* and *Hugo Metzler,* for respondent.

STEINERT, J.—The plaintiff, the operator of a fish hatchery located about a quarter of a mile south of the city limits of Tacoma, brought this action against

[1]Reported in 20 P. (2d) 860.

the city to recover damages for the loss of fish through alleged contamination of the waters of a stream feeding his hatchery, and to enjoin the continuation of the alleged nuisance causing the contamination. Issues having been joined, the case was tried before the court, sitting without a jury, resulting in a judgment for damages and a decree awarding plaintiff injunctive relief. The city has appealed.

Relieved of the detail disclosed by the evidence, a general statement of the case is as follows: Seven or eight blocks west of Union avenue, the principal street in South Tacoma, there is a large swamp extending in a northerly and southerly direction from South 40th street to about South 74th street. The swamp is approximately two miles long, and covers an area of from one hundred and twenty to one hundred and fifty acres. The depth of its waters varies throughout its length. South of South 56th street it is a morass, and its waters, wherever appearing, are shallow; north of South 56th street it attains a greater depth, and resembles a lake. Though the ground between South 56th and South 66th streets is marshy, there is, nevertheless, a constant flow of water through a well-defined channel. The swamp, with its many subterranean springs, drains into and forms what is known as Flett creek, which originates as a distinct stream somewhere near South 66th street and flows southerly through respondent's property, thence in a southwesterly direction until it empties into Chambers creek, which, in turn, flows into Puget Sound. Throughout its course, Flett creek is fed by many springs. At a point a few hundred feet north of respondent's property, its volume is increased about one-third by one of these springs. The stream, before it reaches respondent's property, is about eight feet in width and two in depth, and has a slow and sluggish current.

Three streets extend east and west across the swamp, South 56th and South 66th, both of which have been filled in, and, at the lower end of the swamp, South 74th street. Culverts permit the water to flow underneath the filled streets.

In the year 1906 or 1907, the city of Tacoma installed a twenty-four inch sanitary sewer in the South Tacoma district. This sewer extends, in part, west along South 56th street from Union avenue towards the swamp, then turns north within a block from the swamp and finally finds its outlet in Puget Sound. As the South Tacoma district grew and developed, the burden upon the sanitary sewer likewise grew, yet the size of it was never increased by the city, and it is now the only sanitary sewer serving the district.

Some years after the installation of the sanitary sewer, the city of Tacoma, in order to accommodate the disposal of surface waters, installed a storm sewer system for the South Tacoma district. The storm sewer, which has a diameter of thirty inches, parallels the sanitary sewer along South 56th street and has its outlet in the swamp at a point within a few feet from the culvert underneath that street. Of recent years, the twenty-four inch sanitary sewer has been incapable at times of handling all the sewage from the added connections made necessary by the growth and development of the district.

In order to relieve the congested sewage condition, the city, from time to time, made what is termed "cut-overs" from the sanitary sewer to the storm sewer. At South 56th street, a direct connection between the two sewer systems was made, thereby permitting the excess of sewage to pass from the sanitary sewer into the storm sewer and enter into the waters which formed the source of Flett creek. During certain seasons of the year, these cut-overs were kept

plugged; at other times, they were not. As a consequence, the sewage, of the character to be found in a populous community, was periodically diverted from its normal course and was discharged into the swamp at South 56th street and thence into Flett creek.

From about 1916 or 1918, garbage had been customarily deposited in the swamp north of South 56th street, under the care and direction of the city of Tacoma. In 1930, the city seems to have taken over the matter of garbage disposal as a business, establishing a dump on the west side of the water-flow of the swamp north of South 56th street. The garbage, which was of the type generally collected in a large city, contained refuse from hotels, restaurants and homes, matter that underwent the usual changes of decay and putrefacation. As the garbage was dumped into the swamp, the city mixed it with dirt and gravel so as to make the fill solid.

For many years, the respondent Bales has owned and operated a restaurant in Tacoma. In 1914, he bought a seventeen-acre ranch about a quarter of a mile south of the city limits. Flett creek runs through this property. Conceiving the idea of raising and cultivating a supply of game fish for his restaurant, respondent, in 1928, decided to build a fish hatchery. In that year, he excavated two dirt pools that were fed by springs located on his property, and stocked the pools with eastern brook trout. These trout he successfully raised to maturity. In the early part of 1930, under the direction and supervision of an experienced fish culturist, respondent built and equipped a complete hatchery, investing therein about five thousand dollars. The permanent equipment consisted of five cement pools and a hatchery building covering seven cement troughs. The pools were sixteen feet in diameter and three and one-half feet in depth. The

total lineage of the troughs was one hundred and sixteen feet. A twelve-foot water wheel lifted the water from Flett creek into the hatchery and pools. As the water was lifted and poured from the wheel, it was, to a certain extent, aerated.

After obtaining a Washington hatchery license, respondent purchased ten thousand fingerlings from Pierce county in August, 1929. This was sometime before the hatchery was completed. These fish were placed in Flett creek in wire containers to prevent their escape. About one thousand of these fish died shortly after their delivery. The cause of their death was not determined, and is not material here. After the hatchery was completed, respondent purchased one hundred and three thousand black spotted Montana trout eggs. These eggs were placed in the troughs within the hatchery and, somewhere near July 4, 1930, completed a hatch of about one·hundred thousand fry, which is considered a good hatch for that number of eggs. The planting and hatching of the eggs, the feeding and care of the fish, and the general operation and conduct of the hatchery, was done under the direct supervision and inspection of Mr. Henry Baldridge, the fish culturist who had supervised the construction of the hatchery.

In addition to the initial loss of one thousand of the fingerlings originally purchased from Pierce county, a very heavy loss of fish occurred in April or May of 1930, while they were still being kept in Flett creek. The cause of the loss, however, was then unknown either to respondent or to Mr. Baldridge. The remaining nine thousand fingerlings were transferred to the concrete pools and thereupon showed some improvement. The fish that had been placed in the concrete pools, and those that were confined in the dirt

pools, were both fed with the same kind of food, namely, ground horse meat.

Late in July, 1930, the small fish that had been hatched in the troughs began to die, and in August the "kill", as it is termed, became enormous, the fish dying by the thousands. These fish had been fed ground liver, which is the standard feed for fish of their size and age. At the same time, the larger fish in the cement pools also began to die in large numbers. Mr. Baldridge had the latter fish transferred back into the wire containers in Flett creek. The mortality immediately increased. In an effort to save what was left, the fish were then transferred over into the dirt pools, which were fed entirely by spring water. Those that were not too far gone revived and were raised to maturity. All of the other fish, however, those purchased as well as those hatched, died, except a few that had been placed in pools into which spring water had been pumped.

Suspecting that the fish had in some way been poisoned, respondent and Mr. Baldridge made a close investigation and inspection to determine the cause. The creek was followed to its source. At South 56th street they found a mass of sewage emptying out of the storm sewer into the waters of the swamp as it flowed through the culvert underneath that street. A chemical analysis of a sample of water taken from Flett creek, at or near respondent's premises, was then made, and it was found to be impregnated with colon bacilli, and badly contaminated and polluted. It also showed a sulphate and chloride content produced by the action of the water upon certain ingredients of the garbage dump.

Having found what he considered was the cause of the loss of his fish, respondent filed his claim against the city. Upon its rejection, he began this action to

recover $9,662.50 damages, segregated as follows: $3,500 for loss of fish and $6,162.50 for loss of use of his hatchery. He also sought an injunction against the further emptying of sewage and dumping of garbage into the swamp. In its findings, the court fixed the damages for loss of fish at $2,500, but allowed nothing by way of general damages. The court also directed that a permanent injunction issue against further contamination of the water by sewage and garbage.

There are many details in connection with the various points of the story as we have above outlined it, but a further delineation of them is hardly called for. Our general statement is well within the evidence, and well within the findings made by the court.

The appellant vigorously contends that the loss of the fish was not shown to have been due to any act of the city, and that the findings of the court are not supported by the preponderance of the evidence. It asserts that there was abundant evidence to show that the loss was occasioned through causes other than contaminated water. As probabilities, or possibilities, to explain the loss, it suggests, and upon the trial produced evidence tending to show, that the condition of the water of Flett creek, aside from any effect thereon by sewage and garbage, was unfavorable to fish culture; that respondent was lacking in experience and qualification to engage in the business of hatching and raising game fish; that his equipment was insufficient and inadequate in construction and faulty in operation; that the fish, particularly those in the troughs, were overcrowded; that the feeding was improper as to time, method and quality. The city further contends that an analysis of the results obtained by the respondent in moving the fish from the pools to the creek and from the creek to the dirt and concrete pools, and the results of the experimental changes of

water and feed, demonstrates beyond question that the loss was not due to any contamination of the creek water.

The principal and ultimate question of fact was, what caused the loss of the fish? Was it due to contaminated water, or was it due to some cause not attributable to the fault or negligence of the city?

The evidence was voluminous. The statement of facts, comprising three hundred and thirty pages, reflects the detail to which the case was carefully tried over a period of three days, during which twenty-two witnesses, expert and non-expert, gave their testimony. The record discloses that the court gave the matter very careful consideration in all its details, having due regard to the fact that the city was called upon to defend itself in the exercise of its governmental functions. The facts concerning the hatching and planting of fish, their care over an extended period of time, the circumstances under which the prevalence of disease and its progressive effect became manifest and the results consequent upon the various steps of experimentation in an effort to save the fish, were all before the court, and furnished ample ground for the conclusion that respondent's hypothesis of the cause of complaint had reasonably been established to the exclusion of all other hypotheses. After a careful consideration of all the evidence, we are forced to the conclusion that the findings of the court in respect to the city's maintaining a nuisance are well supported by the evidence, and furnish no ground for disturbance on appeal. *Herz v. Ransom,* 168 Wash. 512, 12 P. (2d) 750.

Appellant contends that the damages allowed by the court are excessive. The court allowed nothing for loss of use of the hatchery. The damages were con-

fined strictly to the loss of fish, and the amount allowed is well within the evidence.

Appellant further contends that the evidence is too conjectural and speculative to afford any basis for recovery. There was specific evidence of what respondent's loss of prospective profits amounted to. Respondent had a market for all fish that he could raise to maturity. The market price of matured fish was definitely established. Those that were not fully grown had a fixed market value at every stage of their development, and the degree of mortality in the usual course of fish culture was predicated upon evidence afforded by experts, and upon which there was no serious dispute.

Appellant relies upon the case of *Larson v. Union Investment Co.*, 168 Wash. 5, 10 P. (2d) 557. That case, on the whole, seems rather to be authority for respondent, for, while it is therein held that evidence to support a judgment for damages may not be vague and uncertain, it is, nevertheless, pointed out that there is a clear distinction between the measure of proof necessary to establish the *fact* of damage and the measure of proof necessary to fix the *amount*. When the fact of damage is established, a more liberal rule is allowed in determining the amount.

That the respondent was damaged in fact, is not disputed; that the damage was occasioned by appellant, is supported by the preponderance of the evidence as found by the court; and that the amount was rested upon evidence of reasonable certainty, we have no doubt. The following cases are authority for the rule herein announced: *Bowman v. Helser*, 143 Wash. 397, 255 Pac. 146; *Suryan v. Lake Washington Shipyards*, 163 Wash. 164, 300 Pac. 941; *Ackerson v. Hama Hama Logging Co.*, 164 Wash. 671, 4 P. (2d) 638.

The appellant also contends that respondent

was not entitled to an injunction against the city. By Rem. Rev. Stat., § 9913, it is a public nuisance

"(2) To throw or deposit any offal or other offensive matter, or the carcass of any dead animal, in any watercourse, stream, lake, pond, spring, well, or common sewer, street or public highway, or in any manner to corrupt or render unwholesome or impure the water of any such spring, stream, pond, lake or well, to the injury or prejudice of others."

Rem. Rev. Stat., § 9921, provides that a private person may maintain a civil action for a public nuisance if it is specially injurious to himself. By our decisions, we are committed to the rule that an injured party may maintain an equitable action to abate such nuisance. *Olsen v. Bremerton,* 110 Wash. 572, 188 Pac. 772; *Hulet v. Wishkah Boom Co.,* 54 Wash. 510, 103 Pac. 814, 132 Am. St. 1127; *Dawson v. McMillan,* 34 Wash. 269, 75 Pac. 807.

A municipal corporation is not immune from an action for damages, nor from one to abate a nuisance. *Mitchell Realty Co. v. West Allis,* 184 Wis. 352, 199 N. W. 390, 35 A. L. R. 396; *Hoffman v. Briston,* 113 Conn. 386, 155 Atl. 499, 75 A. L. R. 1191; 6 McQuillin, Municipal Corporations (2d ed.), §§ 2666 and 2812.

The injuries sustained by respondent were special to himself, differing from those affecting the general public. He was, therefore, entitled to maintain this action upon both its causes.

Appellant makes some suggestion in its brief that, because the city has used the swamp for garbage and, in part, for sewage purposes for many years, the respondent can not now interfere with its established practice. We think that the suggestion has two answers: (1) A city can not, by prescription or lapse of time, acquire the right to maintain a nuisance. *Corsicana v. King,* 3 S. W. (2d) (Tex. Civ. App.), 857;

*Weeks-Thorn Paper Co. v. Glenside Woolen Mills,* 64
Misc. Rep. 205, 118 N. Y. Supp. 1027; *State v. Rabinowitz,* 85 Kan. 841, 118 Pac. 1040, 39 L. R. A. (N. S.) 187;
*Shelby v. Cleveland Mill & Power Co.,* 155 N. C. 196,
71 S. E. 218, 35 L. R. A. (N. S.) 488, Ann. Cas. 1912C,
179; 6 McQuillin, Municipal Corporations (2d ed.),
§ 2880.

(2) The evidence shows that the city has, from time
to time and recently, increased the amount of sewage
and garbage which found its outlet into the waters
of Flett creek. Excess of pollution produced by the
continuation of a nuisance is subject to injunctive
process. *McCallum v. Germantown Water Co.,* 54
Pa. St. 40, 93 Am. Dec. 656; *Matthews v. Stillwater
Gas & Elec. Lt. Co.,* 63 Minn. 493, 65 N. W. 947; *Smith
v. Sedalia,* 152 Mo. 283, 53 S. W. 907, 48 L. R. A. 711;
*Attorney General ex rel. Wyoming Tp. v. Grand Rapids,* 175 Mich. 503, 141 N. W. 890, Ann. Cas. 1915A,
968, 50 L. R. A. (N. S.) 473; *Fansler v. Sedalia,* 189
Mo. App. 454, 176 S. W. 1102; *Corsicana v. King,* 3
S. W. (2d) (Tex. Civ. App.) 857; 6 McQuillin, Municipal Corporations (2d ed.), § 2880.

We think it is fair and appropriate to say that the
inadequacy of the sanitary sewer was not overlooked
by the city's officials. The record discloses that they
took the necessary steps to have the matter of installing a new and enlarged system put up to the voters,
but it was voted down. The neglect, therefore, is not
one of stewardship. The responsibility rests upon the
community as a whole.

We think that the court's findings were fully supported by the evidence, and that the conclusions
drawn therefrom were correct.

The judgment is affirmed.

BEALS, C. J., MAIN, BLAKE, and TOLMAN, JJ., concur.