SHAW et al. v. SALT LAKE COUNTY et al.

No. 7380. Decided November 29, 1950. (224 P. 2d 1037)

See 20 C. J. S. Counties, Governmental authorization as defense to maintaining nuisance, Sec. 319.    See note 145 A. L. R. 611.    See, also, 39 Am. Jur. 478.

*Edward M. Morrissey, A. A. Allen, Jr., W. S. Livingston,* all of Salt Lake City, for appellants.

*Critchlow, Watson & Warnock,* Salt Lake City, for respondents.

McDONOUGH, Justice.

The plaintiffs, eighty-seven in number, residents of an area designated the "Cottonwood District" in Salt Lake County, commenced this suit to enjoin Salt Lake County and the Salt Lake County Commissioners, from constructing and operating in that area, a hot asphalt plant and operations for extracting and processing gravel, including a rock crusher; both proposed operations being in connection with the repair and maintenance of county roads. Salt Lake County had prior to this suit obtained a lease from one Edwin B. Harper of a tract of land in the "Cottonwood District" to be used for these purposes, and had moved rock crushing equipment on the land. The equipment had not been assembled for operation, however, and the hot asphalt plant had not been moved to this location. A temporary restraining order was issued which was made permanent upon a trial of the cause. Salt Lake County and the Salt Lake County Commissioners have appealed.

The "Cottonwood District" is described generally as the area: "From Holladay on the north to and including the homes on the south side of 6200 South on the south, and from Wasatch Boulevard on the east, to and including the homes on the west side of Highland Drive on the west."

This area was characterized by the operator of a real estate business and member of the Zoning and Planning Committee of the Salt Lake County Real Estate Board as the choicest part of the state for residential purposes, and as estate property. Another real estate man, who is

also a party plaintiff in this suit, testified to substantially the same effect.

The proposed location of the hot asphalt plant and gravel operation is immediately east of a smaller gravel pit operation known as the Harper Pit, which is presently in operation, and has been operating for a number of years. It is to be located somewhat north of 62nd South, at what would be approximately 59th or 60th South, and east of Holladay Boulevard some 1160 feet, and lies about 800 feet north of the City Water Reservoir in that area. Since a question is raised as to the sufficiency of the evidence to sustain the determination that a nuisance is threatened, the extent of the operations will be considered later in the opinion and in that connection.

Appellants raise the question as to whether a suit of this type may be maintained against Salt Lake County or the County Commissioners to restrain the creation of a nuisance. It is the contention of the appellants that Salt Lake County partakes of sovereign immunity as a political subdivision of the State of Utah, which precludes the maintenance of this kind of action, in the absence of statutory authorization, which it is contended does not exist.

Section 19—4—3, U. C. A. 1943, covering the general powers of counties indicates that "A county has power: (1) To sue and be sued." This, however, is but a general grant constituting the county an entity to sue and be sued, where it may under other applicable statutes or principles, properly be sued or sue. It is not a blanket authorization for suits to be brought against the counties. No other statutory authorization for this type suit against the county has been called to our attention.

We address ourselves accordingly, to the question of whether the county and county commissioners may be enjoined from creating or continuing a nuisance which inter-

feres with property rights, in the absence of express statutory authorization. We are not here concerned with the matter of damages for personal injuries arising out of nuisances, nor with the question of whether nuisances causing personal injuries may be enjoined.

This court has recognized that counties as quasi-municipal corporations partake of the sovereign immunity of the State, as an arm of the state. In this respect they are similar to school districts. See *Bingham* v. ∎ *Board of Education of Ogden City*, 118 Utah 582, 223 P. 2d 432. In that case we held that a school district was not liable to respond in damages for an injury arising out of a nuisance. In the opinion, the court quoted from the case of *Mokovich* v. *Independent School District of Virginia, No. 22,* 177 Minn. 446, 225 N. W. 292, 293, as follows:

"In passing upon the question of liability of counties, towns, and school districts for torts, in numerous cases in this court, no distinction has been made between negligence and nuisance, except where the tort caused invasion or injury to private property or property rights. * * * The rule of nonliability has been applied in cases where the facts disclosed a nuisance as clearly as in the present case. The rule is placed on the ground that such corporations are not liable for negligence or other wrongful acts or omissions of their officers and agents in performing governmental functions, except in cases of defects in city and village streets, and in cases of invasion or injury to property or property rights. The rule applies, not to negligence alone, but to all torts, including a nuisance." See also *Young* v. *Juneau County,* 192 Wis. 646, 212 N. W. 295.

In the case of *Hansen* v. *Independent School District No. 1 in Nez Perce County,* 61 Idaho 109, 98 P. 2d 959, an injunction was granted the plaintiffs, residents of a particular residential area, against the continuance of night baseball games on school property in that residential area, on the theory that the lights, the increased traffic and shouting and chasing of baseballs onto their property, and interfering with their peace and quiet into the late hours of the night and early morning constituted a nuisance to that residential area. The question of the right to enjoin

the school district is not discussed, but apparently was assumed to exist.

In the case of *Pearce* v. *Gibson County*, 107 Tenn. 224, 64 S. W. 33, 36, 55 L. R. A. 477, the court expressly recognized the right of a private citizen to enjoin a nuisance threatened by the County. The County in that case was erecting a new court house, and proposed to connect its sewers in such a way as to allow the discharge from them to flow upon plaintiffs' lands. Said the court in upholding the injunction:

"* * * But it is well settled that a municipality or county, in the construction of a public work, is not privileged to commit a nuisance to the special injury of the citizens, and for such act is liable as a private individual in damages, or it may be restrained by the writ of injunction."

In the case of *Hunter* v. *Cleveland, C. C. & St. L. Ry. Co.*, S. W. 2d 500, 501, involving an action for damages arising out of a child falling into a concrete ramp at a school building, the court held that the county, acting within its delegated powers in constructing a school building, was immune from suit. In distinguishing the *Pearce* v. *Gibson County case*, the court said:

"*Pearce* v. *Gibson County*, 107 Tenn. 224, 233, 64 S. W. 33, .55 L. R. A. 447, 89 Am. St. Rep. 946, simply applies the universal rule that a court of chancery has authority to enjoin a nuisance."

In the case of *Hunter* v. *Cleveland, C. C. & St. L. Ry. Co.*, 93 Ind. App. 507, 176 N. E. 710, it was held that an injunction would lie to prevent the Board of Commissioners of Marion County and others from discharging waste water and sewage through sewers onto plaintiffs' property. See also: *Burrows et ux.* v. *Tex. & N. O. R. Co.*, Tex. Civ. App., 54 S. W. 2d 1090.

This court in *Aagard* v. *Juab County*, 75 Utah 6, 281 P. 728, 730, determined that a county under proper circumstances might be enjoined from interfering with property

and property rights when, speaking through Mr. Justice ELIAS HANSEN, it said:

" * * If Juab county owns the land, or an easement over the land, upon which the road was constructed, the plaintiff must fail in his action. On the other hand, if the plaintiff is the absolute owner of the land in dispute, he is entitled to some relief by way of quieting his title and enjoining the defendant county from further using his property, unless it chooses to retain the land and compensate the plaintiff therefor."

In the matter of enjoining nuisances created by municipalities, and interfering with or injuring property rights, the courts have made no distinction as to whether the municipality was acting in a governmental or proprietary capacity. See: *Joyce* v. *Village of Janesville*, 132 Minn. 121, 155 N. W. 1067, L. R. A. 1916 D, 426; *City of Corsicana* v. *Albritton*, Tex. Civ. App., 20 S. W. 2d 363; *Bales* v. *City of Tacoma*, 172 Wash. 494, 20 P. 2d 860. The sovereign immunity of municipal corporations as it has developed has been subject to the limitation or exception that it applies only where the municipal corporation is engaged in governmental functions. Thus the immunity granted is substantially that of quasi-municipal corporations, whose duties are governmental, as arms of the state. If a city acting in a governmental capacity may be enjoined from interfering with property rights, then there occurs to us no reason why a quasi-municipal corporation such as a county or school district may not be enjoined from interference with property rights.

The purpose of an appeal to a court of equity for an injunction against the creation or operation of a nuisance is that the applicant has no speedy and adequate remedy at law. In the present case the plaintiffs sought to restrain the creation of a nuisance, which would impair their property rights, and for which damages would provide no adequate compensation even assuming they could be obtained. The principal of sovereign immunity is not one which allows the sovereign to continue

to inflict injury, but rather, one which absolves the sovereign from responding in damages for past injuries. It does not give the sovereign the right to totally disregard the effect of its actions upon the public or adjoining property owners. The doctrine of sovereign immunity is open to criticism, and exceptions have been engrafted upon it repeatedly in order to obviate its harsh effects. See the discussions along this line in the following cases: *Bingham* v. *Board of Education of Ogden City*, 118 Utah 582, 1950, 223 P. 2d 432; *Husband* v. *Salt Lake City*, 92 Utah 449, 69 P. 2d 491; *Niblock* v. *Salt Lake City*, 100 Utah 573, 111 P. 2d 800. This court does not desire to extend the doctrine of sovereign immunity to include immunity from injunction to restrain the creation or operation of a nuisance impairing property rights. Accordingly, we hold that a county may be enjoined from creating or maintaining a nuisance which impairs or injures private property rights. We are not called upon to decide the question of whether or not an action for damages might be maintained in a proper case arising out of a nuisance injuring property rights.

While the County Commissioners are empowered by law, and in fact are required by law to maintain the roads and streets, there is nothing in such authorization or requirement, which gives them the power to unduly interfere with private rights in property. For so doing the Commissioners are amenable to process of the courts by way of injunction.

The appellants contend that the evidence fails to establish that the operation of the hot asphalt plant and gravel operation would constitute a nuisance.

The plaintiffs called witnesses who lived or have lived near hot asphalt plant operations, who testified that smoke, dust, noise and odors emanate from such a plant. One lady who had lived near such a plant told of an occasion when another lady scooped up three tablespoons full of dirt

off her bedspread, and that little tarry specks would get on clothes hung outside, and that the noise of the plant could be heard inside the house. The Chief Engineer of the Power and Heating Division of Salt Lake City, was called as a witness for plaintiffs and testified as to the dust, smoke, odors and impurities cast into the air by a hot asphalt plant, even when operated at maximum efficiency and with the best type equipment. He testified also as to tests conducted as to the extent and coverage of such impurities, and indicated that impurities from such plants had been traced as far as five miles, though not in great concentration at that distance. He testified as to test operations of the City hot asphalt plant, which was equipped with a cyclone collector and water tower, which equipment is designed to catch the dust and impurities from an asphalt mixing plant, and indicated that from May 10th to November 8th, 1948, if the equipment worked at maximum guaranty efficiency, 37 tons of dust would have been liberated to the atmosphere and not collected, and that he was reasonably certain that the plant would not operate more efficiently than the guaranty.

Witnesses were called who lived near gravel pit operations, including crusher operations such as proposed by Salt Lake County. Their testimony was to the effect that the noise was practically unbearable at close range, and was highly disturbing in the area, and that gravel crushers and other gravel operations were extremely dusty operations.

Witnesses who lived in the "Cottonwood District" testified that Mt. Olympus, immediately east of the site of the proposed County operations, acts as a sounding board for noises, and that this is apparent even with the limited operation of the present Harper Pit which consists generally of a gravity loader, screener and four trucks. These witnesses and others of that area testified that the pre-

vailing winds were from the southeast, blowing thus from the site of the proposed operation toward the "Cottonwood District." If this be true, then the dust and smoke and tar residue could be expected to cover the district most of the time when the plant would be in operation.

Commissioner Greenwood testified as to the nature of the equipment proposed to be used, indicating that a portable jaw type crusher would be installed, with a capacity of 100 tons per hour, and a mulch plant which would have a 3,000 pound capacity; that is, would mix 3,000 pounds at a time. They proposed to operate also a bulldozer and a dragline, and diesel powered conveyors and loaders. The capacity of the mulch plant was 600 tons per day and the commissioner indicated that that amount could be used per day for at least 30 to 60 days, and that they would operate 20 trucks to haul the 600 tons in about 100 truck loads per day.

To refute the evidence produced by the plaintiffs, defendants introduced evidence tending to show that many of the objectionable aspects could be minimized or eliminated through planned operations and dust collecting equipment. A witness was produced who lived across the street from the city hot asphalt plant, who testified that she noticed no dust in the air which was traceable to the city plant, and there was no particular machinery noise apparent from it. The manager of the city hot asphalt plant was called and testified that with the dust collecting equipment now installed they didn't have many complaints from the people as they had with the old plant. The city does not operate a rock crusher or other gravel operations at this hot asphalt plant.

An expert was called who testified that the prevailing winds of the area were other than as testified by the witnesses for the plaintiffs. He had not, however, made personal tests of the area in question, but testified generally

as to wind directions in mountain and valley and canyon areas. A witness who lived near the mouth of Big Cottonwood Canyon also testified on behalf of the defendant that in the mornings the wind blew from the east and later in the day blew toward the east.

The evidence is conflicting; however, it does not compel us to take a view contrary to that of the trial court. A review of the evidence shows that it amply sustains his findings, and we are unable to say that he was in error upon our review of that evidence.

Finally, it is contended by the appellants that even though a nuisance is found to exist, there remains the issue of the public good. Commissioner Greenwood testified that the reason for selecting this particular site was that the gravel was suitable with practically all the aggregate needed to manufacture hot mulch, that water was available, and it was as centrally located as could be located in the county for the roads which had to be served.

This court recognizes that in some instances the public good may outweigh the injuries to private rights, and thus allow the court in its discretion to refuse an injunction, just as it may in cases involving purely private rights. It does not appear, however in this case, that substantially identical operations could not be engaged in sufficiently close by to effect the same purposes as the proposed operations on the Harper property would effect, and without causing injury to the plaintiffs. There is evidence of several other gravel operations farther south, and into the mouth of Big Cottonwood Canyon, which, because of the terrain, are effectively blocked off from the "Cottonwood District." In the absence of a showing which would justify the invoking of the doctrine of balancing the equities as between public good and private rights, we are constrained to rule against the appellants on this point.

Judgment for plaintiffs making the injunction permanent is affirmed. Costs to respondents.

PRATT, C. J., and WADE, WOLFE, and LATIMER, JJ., concur.