[No. 41306. En Banc. November 26, 1969.]

PAUL IRWIN et al., *Respondents*, v. WES ESTES et al., *Respondents*, NEW AMERICAN COMMUNITY, INC., et al., *Petitioners.**

*Frank J. Owens* and *Frank Parks Weaver, Jr.*, for petitioners.

*John S. Lynch, Owen J. Wales, Delbert W. Johnson, Roger J. Crosby*, and *Fred D. Gentry*, for respondents.

HILL J.—On August 29, 1969 this court reviewed on a writ of certiorari an order entered on August 28 by the Superior Court for Thurston County which temporarily enjoined the New American Community, Inc., its agents and representative from sponsoring and conducting a proposed Sky River Rock Festival and Lighter Than Air Fair in Thurston County. The order also provided (apparently in response to a cross-claim by the New American Community, Inc. for a writ of mandamus directing the county

*Reported in 461 P.2d 875.

auditor to issue a license for its festival and fair) that in "accordance therewith [the injunction] no license shall be issued for the conducting of the festival." The order further provided that the injunction "shall not be effective until security in the form of Twenty-Five Thousand Dollars ($25,000.00) has been deposited with the Clerk."

It was stipulated at the beginning of our hearing on August 29 that neither cash nor bond in the sum of $25,000 had been deposited with the Clerk of the Superior Court as required by the superior court's order. It was further stipulated that no such deposit would be made.

It was therefore apparent to this court that there was not and would not be a valid injunction. We thereupon entered an order which left the parties in exactly the same position as though there had been no injunction; stating that an opinion giving the legal basis for our order would follow.

■ No public authority was seeking to enjoin the proposed Rock Festival and Lighter Than Air Fair. The injunction was sought by private property owners, with whom the Northern Pacific Railway Co. later joined. For a temporary injunction to be issued at the instance of private parties, as in this case, the posting of a bond is mandatory. A statute (RCW 7.40.080) provides:

> No injunction or restraining order shall be granted until the party asking it shall enter into a bond, in such a sum as shall be fixed by the court or judge granting the order, with surety to the satisfaction of the clerk of the superior court, to the adverse party affected thereby, conditioned to pay all damages and costs which may accrue by reason of the injunction or restraining order. The sureties shall, if required by the clerk, justify as provided by law, and until they so justify, the clerk shall be responsible for their sufficiency.

In *Western Academy of Beaux Arts v. De Bit,* 101 Wash. 42, 171 P. 1036 (1918), we stated that where a statute requires the giving of a bond as a condition precedent to the granting of an injunction, the court is not at liberty to disregard such statute; and it is error in such case to grant the injunction without the required bond.

The Superior Court for Thurston County properly required filing of security with the clerk of that court. It was never filed, and consequently there was no injunction.

■ There being no valid injunction to restrain the holding of the festival and fair, the superior court's direction in its order that no license should issue was without any legal foundation.

The county's requirements for the issuance of such a license date back to 1949. The Thurston County Code, TCC 6.04.010 reads as follows:

It shall be unlawful for any person or group or combination of persons to operate any circus, carnival, or public exposition for profit without first having obtained a license therefor from the county auditor as provided hereinafter.

All applications for such licenses shall be made to the county auditor. Upon application and payment of the license fee, the auditor shall issue a license setting forth the period of time for which such license shall be valid.

It shall be the duty of such licensee to place and maintain such license on the premises in such a position as to be clearly and readily observed by anyone entering the circus, carnival or public exposition.

The license fee shall be twenty-five dollars for each day such circus, carnival, or exposition is to be operated in Thurston County, provided, that the fee for the full number of days shall be paid at the time of original application. (Ord. 1691, §1, 1949).

The language of the ordinance is clear, unambiguous and mandatory in its terms. The duty imposed on the county auditor thereunder is not discretionary, but ministerial.

The law is well summarized in the following statement from Corpus Juris Secundum (53 C.J.S. *Licenses* § 38 (1948)):

under statutes mandatory in terms no discretion is vested in the licensing board or officer, and every person who possesses the statutory qualifications and who complies with the statutory requirements is entitled to a license,

. . .

The superior court's direction to the county auditor in its order of August 28 was tied to the injunction, and when

the injunction did not become effective, the auditor had no choice but to issue the license when the requisite fees were tendered.

The issue of whether this particular festival or fair should be held was never before this court. Neither did we sanction nor approve any violations of the law.

Our order of August 29 was based on two obvious legal propositions:

1. That private parties cannot secure an injunction without putting up a bond as required by statute. (There never was any motion to reduce the amount of the bond, or any suggestion that it was excessive.)

2. That under ordinances which vest no discretion in the licensing officer, and in the absence of an injunction, a licensing officer has no alternative and must issue a license when the applicants comply with the conditions precedent to the issuing thereof.

For these reasons we issued our order of August 29, 1969 disposing of the issues then before us.

HUNTER, C. J., ROSELLINI, NEILL, and McGOVERN, JJ., concur.

FINLEY, WEAVER, and HAMILTON, JJ., did not participate.

HALE, J. (dissenting)—The majority opinion, I think, shows one way not to run a railroad. Thirty or forty trains a day running at speeds of up to 75 miles per hour night and day through fields occupied by thousands of people is a public danger even if the tracks are on an elevated embankment. I, therefore, dissent.

I do agree, however, with the majority's affirmance of the trial court's ruling that the proposed Sky River Rock Festival and Lighter Than Air Fair would create a public and private nuisance and in sustaining the injunction. But the majority, as I do not, accepts the injunction according to its label and considers it temporary, whereas I find it has all of the qualities of finality and deem it a permanent injunction. And if it is a permanent injunction, it requires no bond, and I would have vacated the bond condition. Eliminating

the bond requirement would leave the injunction viable and intact and would engender a denial of mandamus, for the courts will not direct a public officer to license an activity permanently enjoined as a public nuisance.

The proof of public nuisance as it related to the railroad right of way was overwhelming and without dispute. Everyone connected with the case believed that the Sky River Rock Festival and Lighter Than Air Fair would draw a huge throng to camp and sojourn at the site for 3 days and 3 nights. With continuous musical performances of rock music advertised to run from noon to midnight on each of the 3 days on an open-air stage, the festival was bound to attract thousands of young people to the open fields near Tenino alongside the railroad tracks on the Labor Day weekend, 1969.

The constant sound of rock music on juke boxes, radio and television, and frequent rock performances in theaters, auditoriums and open-air concerts, leaves no doubt of its current popularity, especially among young people. Scholars recognize it as something of a popular phenomenon worthy of analysis and comment, too.

Dr. Leroy Ostransky,[1] in describing rock music, circa 1969, attests to its exceptional popularity among the younger segment of our population. Aside from such technical ingredients as primary triads, secondary and nondominant sevenths and modal cadences and tonalities, his analysis, I think, aptly depicts what both the cognoscente and uninformed listener alike actually hear. Rock music, he says, is played in standard two and three part song form; its structure resembles popular and folk songs of all periods. Its harmonies are those found in the Protestant hymns and in 16th Century English folk music. The music melody of rock is simple tonal, easy to sing and repetitive in its sequential melodic patterns. In rhythm, rock music is straightforward duple and triple meter emphasized by propulsive and accepted downbeats. The words of rock music are largely

---

[1] Professor of Music, University of Puget Sound, Tacoma, Washington.

devoted to the themes of love, sex, protest, drugs and growing up.

A typical characteristic of rock music, according to Professor Ostransky—an observation readily corroborative by millions of listeners—is its loudness. Electronic equipment calculated to emphasize the sound of instruments is used to a degree not heretofore associated with music; this amplification is one of its most singular characteristics. Electronic feedback, previously regarded in musical circles both as static and an intrusion, is accepted in rock music as a legitimate rock noise. The high-level volume is considered essential by performers and devotees in moving rock audiences to participate, if only vicariously, in what is described as "rock experience." This was the kind of music billed to be played at the festival for 3 days and 3 nights—from noon to midnight—on an open-air stage, at high volume, over electronic loudspeakers.

In sustaining the trial court's finding of public and private nuisance, the majority gave the closest possible scrutiny to the record. But so fragmented, incomplete and indefinite a record as this, I think, precluded this court from ascertaining the precise nature or even the kind of public and private nuisance which the trial court found would be established. One species of public nuisance, however, the record does unmistakably show—a nuisance arising from the extreme and imminent danger produced by a great throng of people remaining for 3 days and 3 nights in open fields close by a double-track, high-speed, main-line, transcontinental railroad. On this the record is clear and certain, for the facts relating to the railroad—the number, speed and intervals of trains, the size of the expected crowds and the hours of the festival—were undisputed.

Moreover, I am unable to find in the record where the intervenors, New American Community, Inc., and John Chambless, the producers of the Sky River Rock Festival and Lighter Than Air Fair, filed an answer to the complaint or affidavits denying or traversing in any way the railroad's contentions of extreme public danger. Even the

pleading entitled "Petition for Writ of Certiorari, or Alternatively or in Conjunction Therewith, Petition for Writ of Mandate" filed here alleges no facts and is supported by no allegations of fact disputing the issue of public nuisance concerning the railroad. The petition rests on nothing more than the assertion that the trial court erred only in exceeding the relief prayed for in the complaint. Sponsors of the festival did not deny or avoid the allegations of fact upon which the trial court found that the rock festival would amount to a public and private nuisance. Significantly, it was shown that intervenor New American Community, Inc., had agreed to pay a $5,000 rental fee for a brief occupancy of the two fields.

The record shows almost complete agreement, too, as to the physical layout of the site. A double-track main line used by three transcontinental railroads runs north and south on an embankment through the 360-acre tract. The embankment and tracks would afford spectators a superior vantage point and view of the open-air stage. Under the embankment, there existed a 10-foot passageway which the promoters of the festival intended to use as an entrance to and exit from the field where the stage had been set up. Ticket stands were to be erected at the east entrance to the passageway. The railroad embankment thus provided a barrier between the fields adapted by the promoters as a kind of barricade under which the crowds would be channeled in moving from one field to the other. Thousands upon thousands of ticket holders and spectators would in this way be directed into the passageway when going to and from the field containing the open-air stage. Other areas of the 360-acre tract had been set aside for the food and novelty concessions, a "3-day camping area," "free camping area," and parking.

Mr. John H. Hertog, Superintendent of the Northern Pacific Railway Company's Tacoma Division, in an affidavit filed in the Supreme Court supporting the injunction, stated that he had general responsibilities for all operations of the Northern Pacific Railway Company near the pro-

posed rock festival. He said, too, that he was fully familiar with the operations of the Great Northern Railway Company and the Union Pacific Railroad Company which had joint and daily usage of the same tracks running through the festival site. Twice he had inspected the two fields during the time preparations for the festival were in progress, and he attached two maps to his affidavit showing the details of the plan for the festival and the relationship of the ground and facilities to the railroad tracks. His affidavit describes the tracks as follows:

The railroad tracks in this vicinity are located upon a steep embankment, approximately 27 feet in height. The slopes of this fill are sufficiently steep to make their use for longitudinal travel and for seating for viewing festival activities inconvenient and difficult. As a consequence, many viewers and those seeking positions of vantage for travel along the tracks and for viewing festival activities would be attracted to and would be induced to use the top of the fill and the rails thereon for viewing and for travel.

The affidavit continues:

There is no evidence, upon physical examination of the proposed site, of any preparation for keeping people off the railroad tracks or any means to deny use of such railroad track areas to those attending the proposed festival, except for the use of special police or security guards.

Affiant has been informed by experienced security police personnel within the respondent company, and he believes, that under the circumstances that would prevail at such a proposed festival, at least 120 trained police or security guards would be required adequately to protect the attending public from the hazard more specifically described hereinafter. The cost of providing such a force of men, if available on such short notice, would be $4.50 per hour exclusive of normal payroll additives, and a reasonable minimum cost for such protection for the period of the proposed festival would be $5,000.

An alternative method of providing for the safety of the public attending the proposed festival would be the slowing of all trains to a speed of 5 miles per hour through the area to be used for a festival by a general

slow order to all of the railway companies using the Northern Pacific Railway trackage. Such an order would unduly impede travel and commerce and thereby injure the public.

Pursuit of either of these alternative courses will result in substantial financial losses to respondent.

The railroad traffic along the tracks running through the proposed festival site averages approximately 40 trains per day, such trains being operated by the Northern Pacific Railway Company, the Great Northern Railway Company and the Union Pacific Railroad Company, which companies have the right of joint use of such trackage. Some of these trains travel at speeds up to 75 miles per hour, and all of them travel at such speeds that it is impossible to stop them within short distances. Because of the two-way travel, passing of trains is a fairly frequent occurrence in the vicinity of the proposed festival site. The knowledge of a train on one track and the noise attending its operation tend to induce the inexperienced person to ignore, and preclude him from hearing, the approach of trains on the second track, causing a danger not generally appreciated by the public, even those in full possession of their faculties and intending to be careful. The danger from such operation would be increased immeasurably by the noise and competition for attention to be created by the festival activities and the presence of an unsupervised crowd of 25,000 people. If a part of the people in such a gathering, even though it might be a small percentage of all those in attendance, were deprived of the use of their faculties by alcohol or drugs, as was indicated in testimony before the trial court, the danger to them and to others not so incapacitated would be increased even more.

When asked in open court at the hearing on review whether it was true that an average of 40 trains per day, passenger and freight, would operate through the festival site on the railroad embankment at speeds up to 75 miles per hour at all hours of the day and night, all parties through their counsel agreed that this was a fact. The record thus unmistakably, in my view, shows that the rock festival would constitute a nuisance endangering the health and safety of others, and would render persons insecure in life or in the use of property (RCW 7.48.120)—a nuisance

obviously endangering the public in attendance at the festival and the passengers, train crews, and freight and equipment on the trains passing through the festival site at high speeds.

Fully apprised of the great dangers to the public and passengers that the festival would generate and apprehending a great potential legal liability, the railroad chose the way of safety and good sense. It gratuitously assumed a burden it should not have been required to bear and was jockeyed into a choice it should not have been compelled to make. To protect the public and its passengers, crews and equipment, the railroad said it would slow its trains and necessarily maintain a security force throughout a 24-hour day to keep persons off the tracks. Counsel announced the choice in open court, declaring that the railroad would do everything in its power to prevent injury, "slowing or stopping their trains, if necessary." Recognizing that posting the $25,000 bond would probably have alleviated neither the imminent danger nor a potential liability in event of personal injuries, the railroad chose the way of moral over legal victory.

Aside from its responsibilities as a common carrier, the railroad had a right to an injunction as a private party, for a private party may maintain an action to enjoin a public nuisance on a showing of special injury. It showed that it would sustain an injury different from that sustained by the general public. RCW 7.48.210; *Bales v. Tacoma*, 172 Wash. 494, 20 P.2d 860 (1933); *Harris v. Skirving*, 41 Wn.2d 200, 248 P.2d 408 (1952). True, an injunction ought not issue at the behest of a private party if there are reasonably conflicting opinions whether there will in fact be an injury. *Turner v. Spokane*, 39 Wn.2d 332, 235 P.2d 300 (1951). And, if an injunction is sought at the instance of a private party, then a bond must be posted throughout all preliminary injunctive proceedings and until the injunction is final. RCW 7.40.080. Although the record here may reflect a basis for reasonably conflicting opinions as to the festival constituting a private or public nuisance generally, I see no

room in this record for reasonably conflicting opinions as to the great danger arising from the presence of a great crowd of people remaining for so long a time in such proximity to the main line of three railroads.

Should the bond requirement have been vacated? If the injunction were temporary, then I agree it should not, but if the injunction amounted to a final rule, the bond requirement should have been canceled. The obvious purpose of the statute requiring a bond as a condition precedent to the issuance of a restraining order or temporary injunction (RCW 7.40.080) on behalf of a private party is to protect the enjoined party against damage arising from the wrongful issue of the injunctive order. After the injunction has become final and permanent, it would be an absurdity to require a private party who has rendered the public service of permanently abating or enjoining a public nuisance to remain under the expense and responsibility of maintaining the bond. Accordingly, when an injunction has become permanent or is issued upon a final judgment, a bond is not required, for it then has become a rightful injunction and a final rule in the case. *State v. McCoy*, 122 Wash. 94, 209 P. 1112 (1922).

The injunction sent here for review, in my opinion, was final and permanent. Plaintiffs, as private parties, commenced this action in superior court against the Thurston County Auditor and the Thurston County Commissioners claiming that the festival would create a public as well as a private nuisance, and to enjoin the county auditor from issuing a license or permit for it. New American Community, Inc., and John Chambless, the promoters, organizers and sponsors of the festival, entered the case as intervenors but actually became the real parties in interest. As intervenors, they cross-claimed for a writ of mandamus to compel the county auditor to issue them a license or permit on the basis that issuance of such a permit or license was simply a ministerial and not a discretionary function.

I can find no declarations of fact in either the application for mandamus or in its accompanying affidavit traversing

or avoiding the allegations of public and private nuisance. Thus, at the outset of hearings on the application for an injunction, the allegations of ultimate facts upon which a finding of nuisance was sought were undenied and unavoided. Intervening promoters apparently rested their case on the idea that the festival could not as a matter of law be found to be a nuisance and that the issuance, permit or license for it, being a ministerial function, could not be legally blocked.

At no point during any of the hearings before the superior court, as far as I can ascertain, did the sponsors or the promoters of the festival ask for further time or opportunity to present evidence or make an offer of proof. No claim was made in the superior court or in this court on review that additional evidence was available to prove or disprove any of the ultimate facts in the case. Indeed, as a practical matter, time had run out; there was no time for further hearings. Intervenors, New American Community and Chambless, already in the process of incurring financial obligations and commitments for the festival, welcomed an early resolution of the injunction issue and sought an extremely speedy review of it here. On review, no party asked for further opportunity to offer additional proof.

Thus, as earlier observed, facts as to the existence of the railroad tracks, the time and duration of the festival, the physical arrangements of the fields and facilities, and the speed and number of trains passing day and night on the embankment through the festival fields were not only proved but agreed upon, explicitly and understandably, in open court on the hearing on review. The record thus shows undeniably that the festival would create a public nuisance, and that the public nuisance would develop from the imminent danger of death and injury to persons, spectators, train crews and passengers and the likelihood of damage to the railroad's property and equipment by reason of thousands of people being drawn into the open fields adjacent to the tracks to sojourn there day and night for 3 days as 30 to 40 trains daily moved along the tracks day

and night at speeds of up to 70 or 80 miles per hour. Nothing was offered to disprove or traverse the likelihood of this extreme danger and no claim was made that further proof was available to dispute the existence of this public nuisance, particularly as it related to the railroad main line.

The injunction, therefore, in my view, was final and permanent, and the bond requirement, I think, should have been vacated. With a permanent and effective injunction in effect, the mandate to the auditor to issue a permit would not lie. A permit or license is a device to grant a special privilege; it confers a right to do something which one otherwise would not have a right to do. 33 Am. Jur. *Licenses* § 2 (1941); 53 C.J.S. *Licenses* § 1 (1948). I doubt that the courts would order the government to confer upon intervenors the special privilege of conducting and maintaining what had finally been adjudged by a court of competent jurisdiction to be a public nuisance.

Accordingly, I would have vacated the requirement for the $25,000 bond, or any bond at all, denied the writ of mandamus, and let the injunction prevail.

DONWORTH, J.† (dissenting)—This matter is before us upon a writ of certiorari issued, pursuant to the order of the Chief Justice on August 28, 1969, to review a certain order granting a temporary injunction and denying a writ of mandate entered by the Superior Court for Thurston County on August 27, 1969 in a certain action pending wherein Paul Irwin et al. were plaintiffs and Wes Estes et al. (the county commissioners and county auditor) were defendants.

The complaint filed August 22, 1969 (which is designated as Complaint in Nuisance) alleged that plaintiffs were residents of the town of Tenino and that the New American Community, Inc. was proposing to conduct a "rock festival,"[2] at a certain location near the town, which more

†Justice Donworth is serving as a justice pro tempore of the Supreme Court pursuant to Const. art. 4, § 2(a) (amendment 38).

---

[2] The full name of the festival according to its promoters was Sky River Rock Festival and Lighter Than Air Fair.

than 50,000 persons were expected to attend. In sub-paragraphs g. and h. of the first cause of action it is alleged:

g. That activities conducted at prior operations of similar rock festivals indicate that many of the patrons engage in loud and boisterous conduct, trespassing and going over property of other persons, drinking and consuming intoxicating liquor in excessive amounts and on many occasions, conducting themselves in a lewd and dissolute manner; that many of the patrons attending prior rock festivals may be expected to attend the proposed festival and it is reasonable to anticipate that their conduct will annoy, injure or endanger the safety, health, comfort and repose of this plaintiff and others in Tenino similarly situated and will render him insecure in or essentially interfere with the comfortable enjoyment of life or the use of his property.

h. That the defendants proposed to issue a license or permit for such a public exposition or show for the dates of August 30, 31 and September 1, 1969; that the operation so contemplated constitutes a nuisance.

A second cause of action alleged that plaintiff C. T. Jensen resided in an area immediately joining and adjacent to the location of the proposed rock festival where he had about 80 head of cattle, and that at prior rock festivals the participants have appropriated livestock to their personal use for food purposes; that there was real danger the aforesaid plaintiff may be damaged in the loss of his livestock. This second cause of action also contains the same allegations as quoted above regarding the proposed activities of the applicant for the license constituting a public nuisance.

Plaintiff Fred Martin, in a third cause of action, alleged that he owned a parcel of land immediately south of the location of the rock festival and that the premises were presently unoccupied but had substantial growing timber thereon and an unoccupied house and barn of substantial value. It is then alleged in sub-paragraphs b, c and d of the third cause of action:

b. That there is inadequate housing proposed for the patrons of the "rock festival" and that it is probable that many of the patrons will come upon the property of this plaintiff causing damage to his house and barn.

c. That there is considerable dry grass and hay growing on the premises which grass and hay is quite inflammable in nature and it is quite possible that a fire may be started in this dry grass and spreading to the timber and buildings located on this plaintiff's property.

d. An emergency exists and an order should be entered restraining and enjoining the defendants from issuing any permit until a hearing can be held on this complaint.

Then follow allegations similar to the first two causes of action relating to the manner of conducting prior rock festivals and state that the operation of the contemplated one constituted a nuisance.

For a fourth cause of action plaintiff Myrtle Mann alleged she was the owner and resided on certain described real estate adjacent to the location of the proposed rock festival site and further stated:

That she is advised and given to understand that numerous of the patrons attending this type of enterprise are engaged in the use of narcotics or other drug substances and while under the influence of these drugs will likely conduct themselves in a lewd and dissolute manner and trespass or otherwise enter on adjacent property and cause damage thereon; that plaintiff's home residence is immediately across the road from the large field of the proposed tract and that the loud noise will disturb this plaintiff's health, comfort and repose and that it is likely to interfere with her safety and comfortable enjoyment of her property.

She averred that the defendant county officers proposed to issue a license for such rock festival and that the contemplated operation thereof constituted a nuisance.

Plaintiff James Nelson alleged that he was the owner of real property in the immediate vicinity of the rock festival site on which he was running a large number of livestock and that:

this plaintiff is running a large number of livestock in this area; that it is probable that the patrons of the proposed enterprise may come upon the property of this plaintiff and frighten or damage or otherwise interfere with plaintiff's livestock; that the premises is covered

with dry grass which is quite inflammable and that there is a strong likelihood that a fire may be started destroying much valuable property belonging to plaintiff and damaging or destroying his livestock; that said probable conduct is an unreasonable hazard to this plaintiff's enjoyment of the use of his property.

The plaintiffs prayed that an order be entered by the court determining that the proposed facility was a nuisance and forbidding the issuance of a license therefor by defendants.

A temporary restraining order was entered (based on the affidavit of Paul Irwin) restraining defendants from issuing a license until a hearing was had by the court. Defendants were cited to appear on August 26, 1969.

On August 25, 1969 defendants, through the prosecuting attorney, moved for an order joining the New American Community, Inc. and John Chambless, its director, as parties defendant in the action.

On the same day the court issued a show cause order directed to the New American Community, Inc. and John Chambless, its director, requiring them to appear at the hearing set for August 26, 1969. At this hearing it was stipulated by all parties that the corporation and its director be deemed intervenors in the action.

On August 26, 1969 New American Community, Inc. and John Chambless, its director, filed a cross-claim for a writ of mandamus directing the county auditor to issue a license to operate a rock festival pursuant to their application or show cause why he has not done so. The affidavit of John Chambless in support thereof stated that on August 10, 1969 he had attempted to make application for such license and was advised to apply again on August 25. Meanwhile, on August 21, the prosecuting attorney advised affiant not to make an application at that time.

Also on August 26 the corporation and its director filed a motion to quash defendants' order to show cause (which was set for hearing on that date) on three grounds: (1) No showing that defendants had grounds for issuance of a temporary injunction; (2) The county commissioners and

county auditor had no standing to apply for injunctive relief; and (3) Defendants had an adequate remedy at law (if one be necessary).

On the same day the Trans West Company was permitted to intervene as an additional plaintiff. It owned the timber located on the real property owned by the plaintiff Myrtle Mann.

During the hearing on the order to show cause the Northern Pacific Railway Company was permitted to intervene. Its main line tracks running between Seattle and Portland pass through the area where the festival was to be held. At this point its tracks are on a fill which is approximately 27 feet above the level of festival terrain.

The hearing lasted 2 days. In addition to the five plaintiffs and the director of the proposed rock festival, nine witnesses testified at the hearing. It concluded at 8:05 p.m. on August 27, 1969 after the trial court had announced its decision that it would grant the temporary injunction enjoining the New American Community, Inc. and its agents and representatives from sponsoring and conducting the proposed festival, such injunction to become effective upon the filing of a $25,000 injunction bond. No such bond was filed.

The trial court's order so provided and also dismissed the defendants county commissioners and county auditor as not being proper parties to the action.

The order contained the following findings:

> Witnesses having been sworn and testimony having been taken, the Court find that the interest of plaintiffs, defendants, second intervenors, and third intervenors are of common nature and that they will hereinafter be referred to as plaintiffs and that first intervenor's interests are adverse and that they will hereinafter be referred to as defendants. The Court further finds
>
> That the defendants propose to conduct a festival on certain property approximately two miles north of the Town of Tenino and adjacent to the Tenino-Olympia road and that the plaintiffs have complained that the operation of the festival will constitute a nuisance. The Court finds

That the area is rural in type, that access to the festival premises is gained over the Tenino-Olympia road which is two-lane in nature. That the festival will be conducted on the dates of August 30, 31, and September 1, 1969, and that approximately twenty-five thousand (25,000) people would be expected to attend the festival each day. The Court further finds

That the notice of the proposed festival came to public attention on or after August 15, 1969, and that the pattern of prior festivals indicate that some of the persons attending, although few in relation to the total number, are susceptible to criminal acts and that the Court would be derelict in its duty to permit an event to occur knowing possibilities of major infractions of the law as it now exists. The Court further finds

That the tremendous influx of people as will be anticipated over the weekend will unreasonably inconvenience the surrounding property owners, the residents of the Tenino area and of Southern Thurston County, and that adequate advance planning has not been made to protect the interest of the various plaintiffs in their lives, property, comfort and convenience, and as a result, the Court is of the conclusion that the proposed festival constitutes a nuisance private in nature to the immediate property owners and public in nature to the residents of the general area.

## Proceedings in the Supreme Court

On August 28, 1969 the New American Community, Inc. and John Chambless petitioned this court for a writ of certiorari seeking a review of the trial court's order "because the judgment was erroneous and exceeded the jurisdiction of said court and there is no speedy and adequate remedy at law."

On the same day the Chief Justice entered an order for the issuance of the writ, the operative portion of which read as follows:

It is hereby ordered that a Writ of Certiorari, alternatively or in conjunction therewith, petition for writ of mandate issue out of and under the seal of this Court directed to Judge Frank Baker, commanding him forthwith to certify fully and return to this court at 9:00 o'clock on the 29th day of August, 1969, a full and com-

plete transcript of the record and proceedings therein, with the intent that the same be reviewed by this Court as to said claim by petitioners that said proceedings and judgment in said cause were contrary to law.

Because of the emergent time element it was impossible for the trial court to certify and transmit to the Supreme Court at 9 a.m. on August 29, 1969 a full and complete transcript of the record and proceedings in this case. A transcript of the pleadings and the orders of the trial court have been filed in this court, but no statement of facts has been certified and filed, as required by ROA I-57(g)(4).[3] While the minutes of the hearing indicate that a total of 15 witnesses testified in the trial, this court cannot know what their testimony was. From the allegations of the complaint and the trial court's findings, the only inference to be drawn is that much of the testimony related the conduct of patrons at prior rock festivals.

At 10 a.m. on August 29, 1969 the matter was presented to this court pursuant to the order for the issuance of the writ of certiorari. Counsel for all of the parties who had appeared in the trial court were present and presented their respective arguments in support of their clients' positions.

After the hearing an order was entered in which a majority of the justices who had heard the arguments of counsel and had participated in the hearing held: (1) That since no bond had been posted, the temporary injunction was ineffective; and (2) That the denial by the trial court of the New American Community, Inc.'s motion for a writ of mandate directing the county auditor to issue a license for holding the "festival" was erroneous, and this court directed that the license be issued to the applicants forthwith. It was further stated in the order that a majority and a dissenting opinion would follow.

---

[3]*"Filing Record and Proceedings.* Within the time allowed for the service and filing of his opening brief, the petitioner shall file with the clerk of the supreme court such portion of the record and proceedings in the superior court as is needed for the purpose of reviewing the application or the determination. The record shall be certified or authenticated as in causes on appeal."

Presumably the license was issued immediately on the filing of this court's order and the rock festival was held on August 30, 31 and September 1, 1969.

Conceding that the temporary injunction never became effective because the required bond was not posted, I am constrained to dissent from the action of the majority in directing the county auditor to issue a license to the promoters of the rock festival for three reasons: (1) The county auditor was not then a party to the action since the trial court had dismissed him as a party defendant; (2) The trial court found that the proposed rock festival constituted a public and private nuisance; and (3) The trial court's record was not certified or authenticated as required in causes on appeal in compliance with ROA I-57(g)(4), *supra,* and ROA I-37. The certification of a statement of facts in causes on appeal must be signed by the trial judge.

In the absence of a certified statement of facts, this court cannot review any factual issues, but must accept the findings of the trial court as verities. *Clark v. Fowler,* 58 Wn.2d 435, 363 P.2d 812 (1961). Thus, in this case this court is bound by the finding that the proposed rock festival constituted a public and private nuisance and, in my opinion, on review of the trial court's order this court should have affirmed its dismissal of the county auditor.

The rock festival is of very recent origin and there appear to be no decisions of courts of last resort dealing with the question of whether such gatherings constitute nuisances (either public or private). There are, however, numerous decisions relating to public dance halls and public dances as nuisances. There is an exhaustive annotation on this subject appended to the decision of the New Mexico Supreme Court in *Barrett v. Lopez,* 57 N.M. 697, 262 P.2d 981 (1953) which is found in Annot. 44 A.L.R.2d 1377 (1955).

In Section 9 of the annotation (at 1396) a number of cases are cited which hold that on the issue of nuisance it is immaterial whether or not the defendant has received a license from the local authorities to operate a public dance

at a designated location. *See* 4 Am. Jur. 2d *Amusements and Exhibitions* § 40, pp. 161-62 (1962).

Two decisions of this court are in accord with this rule. The proposed operation of a trade school at the Webster School in Spokane was enjoined as a nuisance (even though the legislature had expressly authorized the operation of trade schools by school districts) because of the location and all other factors involved, as pointed out by the majority of this court in *Shields v. Spokane School Dist. 81*, 31 Wn.2d 247, 196 P.2d 352 (1948). A similar result was arrived at by this court in *Bruskland v. Oak Theater, Inc.*, 42 Wn.2d 346, 254 P.2d 1035 (1953) regarding the operation of a motion picture theater in a location zoned for such business. The court held that it was not the showing of motion pictures or the noise of the sound track that created the nuisance, but the part of the business involved in getting patrons on and off the premises.

In light of the authorities cited above, it is my opinion that the trial court's findings (quoted above) must be considered as verities and, accordingly, it should be held that the proposed rock festival constituted a public and private nuisance. I cannot agree with the majority in holding that this court should direct the county auditor to issue the license therefor, because I do not think that a court of equity should in any manner foster the maintenance of a nuisance.

I, therefore, respectfully dissent.